## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE IMMUCOR
INCORPORATED SECURITIES
LITIGATION,

1:05-cv-2276-WSD

## ORDER

This matter is before the Court on Defendants' Motion to Dismiss the Consolidated Class Action Complaint and Brief in Support [15], Plaintiffs' Opposition to Defendants' Motion to Dismiss [23], and Defendants' Reply Memorandum in Support of their Motion to Dismiss [27].[1]

---

[1] Also before the Court are Defendant's Motion to Stay Discovery [24], Specially Appearing State Court Plaintiff Anthony Nardiello's Opposition to Defendant's Motion to Stay Discovery [26], Defendants' Reply Brief in Support of Motion to Stay Discovery [29], Lead Plaintiffs' Motion for Leave to file a Surreply Memorandum in Further Opposition to Motion to Dismiss [28], Defendant's Response to Plaintiff's Motion to File Surreply [32], and Lead Plaintiffs' Reply in Further Support of Motion for Leave to File a Surreply Memorandum [33]. Defendant's Motion to Stay Discovery [24] is DENIED as MOOT. Considering the nature and complexity of this case, Lead Plaintiffs' Motion for Leave to file a Surreply Memorandum [28] is GRANTED.

## I.  <u>FACTUAL BACKGROUND</u>

This is a federal securities class action brought against Immucor, Inc. ("Immucor") and specific officers of Immucor.  Plaintiffs allege claims under §§ 10-b and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j.

Plaintiffs claim that Immucor and individual defendants Edward L. Gallup ("Gallup"), Dr. Gioacchino De Chirico ("De Chirico"), and Patrick Ramsey[2] ("Ramsey") made false or materially misleading statements during the Class Period that knowingly or recklessly understated the scope and gravity of potential Foreign Corrupt Practices Act ("FCPA") violations by Immucor's Italian subsidiary. Plaintiffs allege that these statements and omissions caused artificial inflation of Immucor's stock price, and that the Immucor stock dropped in price after the truth regarding Immucor's Italian became known to the market.  Plaintiffs filed their consolidated class action complaint [8] on February 2, 2006.

---

[2]  On March 7, 2006, Defendants filed a Suggestion of Death pursuant to Federal Rule of Civil Procedure 25(a)(2) advising that Patrick Ramsey died on February 3, 2006.  No party has moved to substitute Ramsey's estate as a party. Because 90 days have expired since the filing of the Suggestion of Death, Plaintiff's claims against Ramsey are DISMISSED pursuant to Federal Rule of Civil Procedure 25(a)(1).

A.    <u>Parties</u>

1.    *<u>Plaintiffs</u>*

The Exchange Act claims are brought on behalf of a class of Plaintiffs who purchased Immucor securities between August 16, 2004, and August 29, 2005 (the "class period").  The lead plaintiffs are the West Virginia Laborer's Pension Trust Fund, Western Washington Laborer's-Employer's Pension Trust, Penny Reno, Pedro Simoes, and Marlin Cob.

2.    *<u>Defendants</u>*

Defendant Immucor "develops, manufacturers, and sells products used to detect and identify various properties of human blood prior to transfusion."  (Defs.' Mot. to Dismiss at 1.)

Defendant Gallup was Immucor's Chairman and Chief Executive Officer during the class period.  (Amended Consolidated Class Action Complaint ¶ 16) ("Complaint").

Defendant De Chirico was Immucor's President during the class period. (Compl. ¶17.)   Prior to the class period, plaintiffs allege that De Chirico was promoted from 1998-present to the positions (respectively) of President of Immucor Italia S.r.l., Director of European Operations, President of Immucor,

Chief Operating Officer, and Chief Executive Officer.  Plaintiffs allege that

De Chirico "relinquished his role as CEO" during the first month of the class

period, but retained his responsibilities as President. (Id.)

>       B.      Plaintiffs' Allegations

Plaintiffs claim that Defendants made a series of misleading statements and

omissions that understated the seriousness of corruption problems in Immucor's

subsidiary in Italy.  Plaintiffs allege that this series of misleading statements and

omissions, which included SEC filings, press releases, and conference calls with

stock analysts, misled potential investors into an overly optimistic assessment of

the scope of Immucor's corrupt foreign business practices and of the strength of

Immucor's internal control mechanisms.  Plaintiffs allege these misrepresentations

artificially inflated Immucor's stock price during the class period, and that the

stock price degraded significantly when the SEC announced a formal investigation

into Immucor's practices.

Specifically, Plaintiffs allege that De Chirico, beginning in 1998, was

personally involved with a series of bribes, contract manipulations and other

improper business practices in Immucor's Italian subsidiary, including funneling

illegal payments through Immucor's German subsidiary to a Swiss bank account.

(Compl. ¶¶ 47-49.)  Plaintiffs contend that De Chirico was promoted to President and CEO of Immucor after committing these acts.  Plaintiffs allege that De Chirico, Gallup, and Immucor, knowing that criminal conduct had occurred at least since 1998 and knowing Immucor to be criminally liable for De Chirico's conduct, did not disclose this significant criminal exposure and misrepresented to investors that De Chirico's multiple improper acts at the Italian subsidiary were no more than isolated administrative issues resulting from poor record-keeping.  Plaintiffs also allege that Defendants publicly misrepresented the strength of Immucor's internal controls.

Plaintiffs claim that De Chirico and Gallup are individually liable as control persons for Immucor's alleged Exchange Act violations because they had "direct and supervisory involvement in the day-to-day operations of the Company." (Compl. ¶ 112.)

Plaintiffs allege two counts based on the claimed misconduct of the Defendants.  In Count I, Plaintiffs seek damages under Section 10(b) of the Exchange Act for various alleged false and misleading statements and omissions. Count I is asserted against Immucor, and against Defendants De Chirico and Gallup individually.  In Count II, Plaintiffs seek damages against De Chirico and

Gallup under § 20(a) of the Exchange Act on the theory they were "control persons" of Immucor and thus liable personally for the alleged violations in Count I.

Plaintiffs anchor their fraud allegations to five statements that they contend were false or misleadingly incomplete:

1.    *Statement No. 1--The August 16, 2004 10-K*

Plaintiffs allege that Defendants' first fraudulent statement occurred in Immucor's August 16, 2004[3] annual 10-K filing with the SEC.  This date marks the start of the class period.  The statement with which Plaintiffs take issue was signed by De Chirico and Ramsey, a former Immucor CFO.  The filing reads, in relevant part:

> As of the end of the period covered by this report, [Immucor] carried out an evaluation, under the supervision and with the participation of [Immucor's] management, including [Immucor's] Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of [Immucor's] disclosure

---

[3]  Plaintiffs Complaint contains several dating errors.  For example, Plaintiffs refer to the class period as beginning on August 16, 2004 in ¶ 1, but then assert in ¶ 60 that the beginning of the class period is August 16, 2005.  Similarly, in ¶ 62, Plaintiffs misstate that the press statement released on November 2, 2004, was released on November 2, 2005.  In a securities action, where allegations must be pled with specificity, such errors can jeopardize the viability of a claim.

> controls and procedures pursuant to Rule 13a-15(e) and
> 15(d)-15(e) under the Exchange Act.  Based on that
> evaluation, the Chief Executive Officer [De Chirico] and
> Chief Financial concluded that [Immucor's] disclosure
> controls and procedures are effective. There were no
> changes in [Immucor's] internal control over financial
> reporting or in other factors identified in connection with
> that evaluation . . . that has materially affected, or is
> reasonable likely to materially affect, [Immucor's]
> internal control over financial reporting.

(Compl. ¶ 60.)

Plaintiffs claim that this statement was materially false or misleading

because "Defendants knew, but failed to disclose, the true nature and scope of

Immucor's criminal involvement in Italy and knew that the Company's internal

controls were severely deficient."  (Compl. ¶ 61.)

2.     *Statement No. 2--The November 2, 2004 Press Release*

Plaintiffs allege that an Immucor press release dated November 2, 2004[4]

titled "Immucor Italian Subsidiary Part of Inquiry in Italy" constituted a fraudulent

statement.  The press release read, in relevant part:

> Immucor . . . today announced that its Italian Subsidiary
> and the subsidiary's former president, and now President
> of Immucor, Inc., Dr. Giocchino De Chirico, are the
> subject of criminal investigation in Milan, Italy.  The

---

[4]  Plaintiffs misstate the date of this press release as November 2, 2005.

> investigation . . . concerns alleged improper cash
> payment by several companies to the physician in
> exchange for favorable contract rewards. . . .
>
> As a result of the investigation in Milan, the Audit
> Committee of the Board of Directors . . . commenced an
> internal investigation.  The investigation has found that
> the doctor rendered services as the organizer and
> chairman of a convention sponsored by the Italian
> subsidiary in October, 2003, for which he received
> 13,500 euros via wire transfer.  The invoice for those
> services, however, did not properly identify the doctor or
> the nature of his services, in violation of the Foreign
> Corrupt Practices Act.
>
> Because of his involvement with the payment of the
> invoice, Dr. De Chirico will not act as CEO of the
> company during the internal investigation, but will
> remain as President.  Edward L. Gallup, the Chairman of
> the Board, will undertake the responsibilities of CEO on
> an interim basis.  In addition, the Board of Directors is
> taking steps to strengthen financial controls in its
> European operations.
>
> The Company is fully cooperating with the investigation
> in Italy. . . .

(Compl. ¶ 62).

Plaintiffs allege that this statement was false or misleading when made

because "Defendants knew, but failed to disclose, the true nature of Immucor's

involvement in criminal activity in Italy."  More specifically, Plaintiffs allege that

Defendants misrepresented the situation as an "isolated instance of poor record keeping" when it was engaged in "serious and extensive criminal activit[y] . . ." (Compl. ¶ 63).

       3.    <u>*Statement Number 3--The December 16, 2004 8-K Filing*</u>

Plaintiffs allege that Immucor's December 16, 2004 Form 8-K filing, amending Immucor's Code of Conduct, constituted a fraudulent statement.  That filing read, in relevant part:

> Immucor is committed to open and fair business conduct worldwide.  Conducting our business ethically encompasses compliance with applicable U.S. and non-US laws, including the U.S. Foreign Corrupt Practices Act . . . and other laws aimed to prevent and punish corrupt practices. . . . (referred to as the "Law" in the remainder of this section).
>
> Immucor's employees and agents should understand fully that any actions taken by them on behalf of the company in violation of the Law may create criminal exposure for themselves, the Company and, in certain circumstances, our non-US affiliates.  Immucor trusts in the integrity of its employees and expects each to comply willingly and completely with the Law and this Code.
> Some Laws, including the FCPA, impose a statutory duty on Immucor to maintain accurate books and records and an adequate system of internal accounting controls.  All Immucor affiliate, US and non-US, must comply with these record-keeping and control requirements.

(Compl. ¶ 64).

 The amended Code of Conduct also contained "Policies" that comprehensively forbade employees from bribing foreign or domestic officials and further detailed the necessity for accurate and complete accounting procedures.  <u>Id.</u>

 Plaintiffs allege that this statement is false and misleadingly incomplete because "Defendants falsely assured the market that [Immucor] was taking active steps to address its internal control failures arising from criminal investigation in Italy when, in fact, Defendants were continuing to hide the true nature and scope of [Immucor's] involvement in the scandal."  (Compl. ¶ 65.)

   4. <u>Statement Nos. 4 & 5--the January 7, 2005 Press Release and Analyst Teleconference</u>

 Plaintiffs allege more fraudulent statements in an Immucor press release and press conference of January 7, 2005.  The press release reads, in relevant part:

> In connection with its preparation for Sarbanes Oxley . . . the Company had identified certain weaknesses in internal controls in the Italian subsidiary at the time it learned of the Italian investigation, and the Company was in the process of strengthening those internal controls. Those efforts were accelerated in connection with the internal investigation, and the Company has undertaken a thorough review of the books and records of the Italian subsidiary with the assistance of forensic audit personnel from PricewaterhouseCoopers LLP.  That review has

> identified a number of improperly recorded transactions
> totaling approximately $730 thousand. . . . Due to the fact
> that the quantification of these items have only recently
> come to light, the Company expects to file its form 10-Q
> for the second quarter of fiscal 2005 with the Securities
> and Exchange Commission . . . .

(Compl. ¶ 66.)

The analyst teleconference, held on the same day and in which Gallup and

Ramsey jointly participated, contained the following statements that Plaintiffs

allege to be false or materially misleading:

> Ramsey:  We have now completed a comprehensive
> review of the books and records, and have found a
> number of improperly recorded transactions, which total
> approximately $730,000, the most serious of which was
> the failure to timely remit to the appropriate fiscal
> authorities VAT collected from our customers.  This
> omission will result in penalties and interest of
> approximately $350,000.  The balance of the improperly
> recorded transactions relate to poor book keeping.  We
> have terminated the responsible party and are evaluating
> our internal audit function.  Our assessment of current
> internal controls have revealed no similar controls in any
> other affiliate.  We believe this is an isolated event. . . . .
>
> [Question by analyst] P. Frohlich:  On this Italian
> investigation, the initial payment that was – we talked
> about possible violations of the Foreign Corrupt Practices
> Act, which was – the more I read about it was pretty
> disturbing.  I did not hear that these were – I think you
> mentioned VAT taxes and some items like that – that

> there are no other payments of the – similarly to the EUR
> 13,500 payment [alleged by Plaintiffs to have been a
> bribe]?
> Gallup:  Over a ten year period we paid approximately
> $200,000 worldwide in consulting fees.  So in this
> $732,000, <u>there are no payments:  absolutely</u>.
>
> P. Frohlich:  Okay.  So at this point in time, the only I
> think what you characterized as possible violation was
> the 13,500 and that still stands?
>
> Gallup:  <u>That is correct</u>. . . .
>
> (Compl. ¶ 67) (emphasis added).

Plaintiffs allege that the press release and statements made during the press
conference were materially misleading because they presented an untruthful
outlook on the scope and gravity of the impact of the Italian investigation by,
among other things, characterizing it as an "isolated event" when Immucor had in
fact committed multiple acts of corruption beginning at least in 1998.  (Compl.
¶ 68; 72.)  Plaintiffs allege that the PricewaterhouseCoopers investigation,
mentioned both in the press release and by Gallup and Ramsey in the
teleconference, had identified "90 payments to various doctors, at least 20 of which
were legally doubtful," directly contradicting Immucor's assurances that any
incidences were isolated. (Compl. at ¶ 8.)  Plaintiffs offer the responsive statements

of several analysts and an alleged increase in Immucor stock prices as evidence of the effect of the January 7, 2005 statements.

5.   *Statements No. 6 and 7--The January 11 and 14, 2005 10-Q Statements*

Plaintiffs allege that statements made by the Defendant in its January 11, 2005 Form 12b-25 filing (notifying the market that it would file late its Form 10-Q statement for the period ending in November), and January 14, 2005, filing of the Form 10-Q itself, were materially misleading.

In the January 11, 2005, 12b-25, Plaintiffs allege that Defendants claimed some of the questionable transactions "only recently came to light."  The January 14 Form 10-Q filing read, in relevant part:

> In addition, as reported in a press release issued by the Company on November 2, 2004, the Company's Italian subsidiary and [De Chirico] . . . are the subjects of a criminal investigation by Italian authorities in Milan, Italy . . . . Based on the Company's internal investigation discussed further below, it does not appear that the Italian subsidiary made any improper payments to the physician in question.  However, the doctor rendered services as the organizer and chairman of a convention sponsored by the Italian subsidiary in October 2003, for which he receive 13,500 Euros, and the invoice for those services did not properly identify the doctor or the nature of his services, in violation of the [FCPA].  On November 1, 2004, the

> Company self-reported to the [SEC] the potential
> violation . . . .
>
> As of the end of the period covered by this report, the
> Company carried out an evaluation, under the
> supervision and with the participation of the Company's
> management, including the Company's [CEO and CFO],
> of the effectiveness of the design and operation of the
> Company's disclosure controls and procedures . . . Based
> upon that evaluation, the [CEO and CFO] concluded that
> the Company's disclosure controls and procedures are
> effective.

(Compl. ¶¶ 70-71.)

Plaintiffs allege that these statements were materially misleading because Defendants "knew, but failed to disclose, the true nature and scope of Immucor's involvement in illegal activity in Italy."  (Compl. ¶ 72).

6. *Statements Number 7, 8, and 9--April 6 and April 8, 2005 10-Q Statements*

The last series of statements alleged to be fraudulent by Plaintiffs occurred on April 6 and April 8, 2005, in connection with Immucor's April 8, 2005 10-Q for the period ending on February 28, 2005.

On April 6, Plaintiffs allege that Gallup, on behalf of Immucor, hosted a conference call for securities analysts.  During that call, Plaintiffs allege that Gallup said, "With respect to Italy, the Company's internal investigation is

essentially complete, and we continue to reiterate that all services paid for were in each case for services rendered. . . . . there is no question that we did violate the [FCPA] paperwork provision, and we expect there is a possibility of a fine associated with this, but I can't imagine that it would be in the $2 million range, but we are being aggressive in putting that number out there."

Plaintiffs allege that later on April 6, 2005, Ramsey stated, "We will have the internal controls tightened up and fully tested prior to them opening in August. . ."

Immucor's Form 10-Q filed on April 8, 2005, read, in relevant part:

> In addition, as reported in a press release issued by the Company on November 2, 2004, the Company's Italian subsidiary and Dr. [De Chirico] . . . are the subjects of a criminal investigation by Italian authorities in Milan, Italy. . . .  The investigation concerns the alleged improper cash payments by several companies to the physician in exchange for favorable contract awards by his hospital in Italy.  Based on the Company's internal investigation discussed further below, it does not appear that the Italian subsidiary made any improper payments to the physician in question.  However, the doctor rendered services as the organizer and chairman of a convention sponsored by the Italian subsidiary in October 2003, for which he receive 13,500 Euros, and the invoice for those services did not properly identify the doctor or the nature of his services, in violation of books and records provision fo the [FCPA].

(Compl. ¶ 77.)

Plaintiffs allege these statements were materially false and misleading because "by this time, in addition to the illegal payments [mentioned], the expanded investigation revealed that additional payments were made to numerous other doctors throughout Italy . . ."  Plaintiffs further allege that illegal payments under De Chirico's direction commenced in 1998, and that "[a]ccording to the investigation . . . Immucor funneled money . . . through its German subsidiary" in furtherance of its corrupt activity.  (Id. at ¶ 48; 78.)  Plaintiffs further allege that "the Company's internal investigation conducted through [PricewaterhouseCoopers] revealed that at least 20 of the payments made to various physicians were legally doubtful."  (Id.)

       7.    *Later Disclosures*

Plaintiffs allege that the "truth" about the scope and gravity of Immucor's activities was revealed to the market on August 26, 2005, shortly after noon.  At that time, Immucor announced that the Securities Exchange Commission ("SEC") had issued a formal order in its investigation "relative to payments made by one of [Immucor's] foreign subsidiaries to individuals associated with government medical facilities."  (Id. ¶ 79.)  Plaintiffs allege that because announcements of

formal SEC investigations are significant, the August 25, 2005 announcement

provided notice to the market of the gravity to Immucor's situation.  (Id. ¶¶ 80-81.)

  C. Defendants' Motion to Dismiss

  Defendants contend that the Complaint should be dismissed for four reasons.

First, Defendants claim that Plaintiffs have not alleged any materially false or

misleading statements.  Second, Defendants contend with respect to Defendant

Gallup that Plaintiffs have not pled sufficient facts to support the strong inference

of scienter required by the Private Securities Litigation Reform Act.  Third,

Defendants contend that Plaintiffs have failed adequately to allege loss causation

resulting from any of Defendants statements.  Fourth, Defendants contend that

Plaintiffs' claims under § 20 of the Exchange Act fail because Plaintiffs have not

pled adequately a primary violation.

## II. STANDARD OF REVIEW

  A. Standard of Review for Motion to Dismiss

  A "complaint should not be dismissed for failure to state a claim unless it

appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46

(1957).  On a motion to dismiss, the allegations contained in the complaint must be

-17-

accepted as true and the facts and all inferences must be construed in the light most favorable to the plaintiffs.  See Cooper v. Pate, 378 U.S. 546, 546 (1964); Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998); Conner v. Tate, 130 F. Supp. 2d 1370, 1373 (N.D. Ga. 2001).  Plaintiffs may not, however, assert bare legal conclusions.  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).

> B.     Standard of Review for Federal Securities Fraud Case

>> 1.     *Expanded Evidence Considered*

When considering a motion to dismiss in a securities fraud case, the Court may take judicial notice of the contents of relevant public documents that were required to be filed with the SEC and which were actually filed.  See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1999).  The Court may also consider evidence outside the pleadings that is undisputedly authentic and on which plaintiffs specifically relied in the complaint.  Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999).  If "a complaint fails to plead facts that, if true, would constitute a misrepresentation, and does nothing more than offer the legal conclusion that a representation was somehow misleading, dismissal of plaintiff's

claims is appropriate." In re Friedman's, Inc. Sec. Litig., 385 F. Supp. 2d. 1345, 1358 (N.D. Ga. 2005).

A misrepresentation is "material" if "there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Id. at 1359 (internal quotations omitted).  In other words, "a misstatement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important to an investment decision." Id.

### 2.   *Heightened Pleading Requirements*

Allegations of securities fraud must satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires pleading with particularity.  Although Rule 9(b) addresses fraud generally, there is no question that its particularity requirements apply to claims under Section 10(b) and Rule 10b-5.  See, e.g., In re Towne Servs. Inc. Sec. Litig., 184 F. Supp. 2d 1308, 1316 (N.D. Ga. 2001).  Rule 9(b) requires plaintiffs to plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the

misrepresentation[5] and what was obtained or given up thereby . . . .  [C]onclusory

allegations that a defendant's conduct was fraudulent and deceptive are not

sufficient to satisfy the rule."  <u>Parnes v. Gateway 2000, Inc.</u>, 122 F.3d 539, 549-50

(8th Cir. 1997) (dismissing complaint because plaintiffs' allegation of fraud "is

simply not particularized") (quotation omitted).  Rule 9(b) requires plaintiffs in a

securities fraud case to specify the who, what, when, where and how of the alleged

fraud.  <u>See</u> <u>In re World Access, Inc. Sec. Litig.</u>, 119 F. Supp. 2d 1348, 1353 (N.D.

Ga. 2000).

---

[5]  Defendants do not contend that Plaintiffs' claims should be dismissed because Plaintiffs fail to attribute particular statements to particular individuals. Plaintiffs apparently rely, in some instances, on the group pleading doctrine to plead that certain statements conveyed in the company's releases are the collective actions of the Individual Defendants.  The Eleventh Circuit has not definitively ruled on the continuing viability of the group pleading doctrine after the enactment of the PSLRA.  The Court finds that the doctrine necessarily applies and Plaintiffs have pleaded claims against the Individual Defendants.  <u>See, e.g.</u>, <u>In re AFC Enters., Inc. Sec. Litig.</u>, 348 F. Supp. 2d at 1371 (finding group pleading doctrine remains viable in appropriate circumstances).  Application of the doctrine is particularly fair and appropriate in this case in which the alleged misrepresentations are contained in releases in which the Individual Defendants -- as Chief Executive Officer and President -- were necessarily involved and under whose authority they were issued.

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, imposes additional pleading requirements for plaintiffs in securities fraud cases. First, the PSLRA requires a plaintiff to specify each statement or omission alleged to be misleading, the reason why the statement or omission is misleading, and the facts surrounding the alleged misrepresentation. 15 U.S.C. § 78u-4(b)(1). Second, the PSLRA requires a plaintiff, "with respect to each act or omission . . . [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

If the plaintiff does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss. See 15 U.S.C. § 78u-4(b)(3)(A).

C.   Elements of Plaintiffs' Exchange Act Claims

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, mandates that no person shall "use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5 implements and clarifies §10(b) by specifying the types of behavior forbidden:

(a)  To employ any device, scheme or artifice to defraud;

(b)  To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2006).

The Eleventh Circuit construes § 10(b) and its implementing rule to require the demonstration of: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused [plaintiffs'] injury." <u>Bryant v. Avado Brands, Inc.,</u>187 F.3d at 1271, 1281 (11th Cir. 1999).  Regarding the scienter element, the Eleventh Circuit has found that "a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." <u>Id.</u> at 1287.  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is

so obvious that the defendant must have been aware of it."  Theoharous v. Fong, 256 F.3d 1219, 1225 (11th Cir. 2001) (quotations and citations omitted).

Section 20(a) provides for "controlling person" liability where an Exchange Act violation is found.  15 U.S.C. § 78t(a).  To successfully allege control person liability under Section 20(a), plaintiff must allege that:  (1) the company violated the Exchange Act; (2) the defendant had the power to control the general business affairs of the company; and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation.  See id., 256 F.3d at 1227. A defendant is not liable as a control person under § 20(a) unless a primary violation of the securities laws is proved.  Id.

## III.  DISCUSSION

### A.    Pleading Requirements

Initially, Plaintiffs must satisfy the pleading requirements for each of their alleged securities violations.  The PSLRA requires Plaintiffs to identify the specific statements or omissions alleged to be misleading, articulate the reasons why each statement or omission was misleading, identify the time, place and context of each allegedly misleading statement, and state facts sufficient to create a strong inference of scienter.  In short, Plaintiffs must set forth the "who, what, when,

where, and how" of the Defendants' allegedly fraudulent behavior.  See In re

World Access, Inc. Sec. Litig., 119 F. Supp. 2d at 1353.

   The Eleventh Circuit recently clarified that "shotgun pleading," in which a

Plaintiff fails to link specific factual allegations with the substantive counts of a

complaint, is impermissible.  Wagner v. First Horizon Pharma. Corp.,  -- F.3d --,

2006 WL 2661652 (11th Cir., Sept. 18, 2006).  If Plaintiffs fail to connect their

factual allegations to their substantive counts, the Court will use its discretion

under Federal Rule of Civil Procedure 12(e) to require repleading.  Id.

   As a general matter, Plaintiffs' allegations satisfy the heightened

requirements of the PLRSA, and Defendants do not claim that these requirements

have not been met.  Plaintiffs have identified nine specific statements and filings

they allege to have been misleading.  With respect to each statement, Plaintiffs

assert why they allege that the statement was misleading, specifically stating that

each statement misrepresented the nature and scope of the alleged acts of bribery

that allegedly occurred in Immucor's Italian subsidiary or misrepresented that

Immucor had in place controls adequate to prevent the wrongful conduct alleged.

Plaintiffs identify with specificity the time, date, and circumstances of each

allegedly misleading statement.

-24-

Plaintiffs also allege facts associated with each statement that, when considered in the aggregate, allow the Court to evaluate whether there is a "strong inference of scienter."  Plaintiffs allege that De Chirico was directly involved with -- and in fact in charge of -- the wide-ranging criminal conduct the Defendants are alleged to have misrepresented.  Plaintiffs also allege facts which they claim give rise to a strong inference that Gallup knew or strongly suspected that Immucor had engaged in multiple acts of bribery through its Italian subsidiary, yet made recklessly misleading statements about the nature and scope of those acts and about De Chirico's alleged criminal conduct.  Plaintiff's allegations of materiality and scienter will be discussed in greater detail below.

Finally, Plaintiffs sufficiently link their factual allegations to their substantive counts to avoid the need to replead.  Although Plaintiffs incorporate all of the Complaint's ninety-seven paragraphs of alleged fact into their § 10(b) count, they also restate certain specific facts within the count to provide sufficient linkage between the fact allegations and the count.  Because the §10(b) count is the only independent count of the Complaint,[6] the Court is not required to guess which of

---

[6] Plaintiffs include a count under § 20(a), but it depends on an underlying 10(b) violation.

the incorporated alleged facts are intended to support the count. The Court

concludes that all of the incorporated alleged facts are intended to support the

10(b) count.

     B.     <u>Material Misstatement or Omission</u>

To state a claim of securities fraud under the Exchange Act, a complaint

must allege a misstatement or omission of a material fact.  Defendants first move to

dismiss on the grounds that none of the misstatements or omissions alleged are

material.

If a complaint fails to plead facts that, if true, would constitute a

misrepresentation, and does nothing more than offer the legal conclusion that a

representation was somehow misleading, dismissal of plaintiff's claims is

appropriate.  <u>Oxford Asset Mgmt., Ltd. v. Jaharis</u>, 297 F.3d 1182, 1194 (11th Cir.

2002).  "In other words, if no reasonable investor could conclude public

statements, taken together and in context, were misleading, then the issue is

appropriately resolved as a matter of law."  <u>In re K-Tel Int'l, Inc. Sec. Litig.</u>, 300

F.3d 881, 897 (8th Cir. 2002) (quotation omitted).

Omissions are judged by the same general principle.  Omissions of material

fact "are proscribed only when the defendant has a duty to disclose."  <u>Ziemba v.</u>

Cascade Intern., Inc., 256 F.3d 1194, 1206 (11th Cir. 2001) (quotations omitted).

A duty to disclose arises when "a defendant's failure to speak would render the

defendant's own prior speech misleading or deceptive." Id. (quotation omitted).

"A duty to speak the full truth arises when a defendant undertakes to say

anything." First Virginia Bankshares v. Benson, 559 F.2d 1307, 1317 (5th Cir.

1977).[7]  In other words, omissions are proscribed "where the defendant has a duty

to speak [or] where the defendant has revealed some relevant, material information

even though he had no duty (i.e., a defendant may not deal in half-truths)." Id. at

1314.

      An alleged misrepresentation or misleading omission must be material to be

actionable under the securities laws.  The materiality element is satisfied if there is

a substantial likelihood that disclosure of the omitted fact would have been viewed

by the reasonable investor as having "significantly altered the total mix of

information made available." Oxford Asset Mngmt., Ltd., 297 F.3d at 1189

(quotation omitted).  Put another way, a misstatement or omission is material if

there is a substantial likelihood that a reasonable shareholder would consider it

_____

      [7] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981), the
Eleventh Circuit adopted decisions of the former Fifth Circuit, issued on or before
September 30, 1981, as binding in this circuit.

important to an investment decision.  Basic, Inc. v. Levinson, 485 U.S. 224, 234

(1988).  Conversely, "a fact is immaterial where a reasonable investor could not

have been swayed by the misrepresentation."  In re K-Tel Int'l, Inc. Sec. Litig., 300

F.3d at 897 (quotation omitted).

 "The trier of fact usually decides the issue of materiality."  Oxford Asset

Mgmt., Ltd., 297 F.3d at 1189.  However, if it is plain that the alleged

misstatement or omission lacked importance and reasonable minds could not differ

on the question of its importance, it is proper for the court to pronounce a

misstatement or omission immaterial as a matter of law.  Id.; Parnes v. Gateway

2000, Inc., 122 F.3d 539, 547 ("Alleged misrepresentations may also present or

conceal such insignificant data that, in the total mix of information, it simply

would not matter to a reasonable investor.").  "In assessing whether a

misrepresentation or omission was material, courts may not employ 20/20

hindsight; instead, they must consider whether the misrepresentation or omission

was material on the date the prospectus or registration statement was issued."  In re

Unicapital Corp. Sec. Litig., 149 F. Supp. 2d 1353, 1363 (S.D. Fla. 2001).

1.      _Statement No. 1--The August 16, 2004 10-K_

Plaintiffs claim that the August 16, 2004 10-K statement was materially false or misleading because "Defendants knew, but failed to disclose, the true nature and scope of Immucor's criminal involvement in Italy and knew that the Company's internal controls were severely deficient."  (Compl. ¶ 61.)

Plaintiffs contend that Immucor and De Chirico knew that when De Chirico managed European operations (prior to his promotion to company President and CEO), he had cultivated weak controls in the Italian subsidiary and had exploited those weaknesses in a series of corrupt business practices.  Plaintiff's Complaint states De Chirico "left Europe" in 2003, and that "his replacement, Didier Lanson, changed the manner in which expenses were authorized."  (Compl. ¶ 50 n.6). The complaint, read as a whole, assumes that concealment of De Chirico's alleged wrongful conduct while in charge of the Italian subsidiary, including concealment of the allegedly weak controls that allowed De Chirico to engage in that conduct, allowed those weak controls to persist even after De Chirico left for a more senior management position.

Immucor admits in its Motion to Dismiss that bringing the accounting practices of its European subsidiaries into compliance with U.S. law has been a

"formidable business challenge."  (Def.'s Mot. to Dismiss at 2).  In its January 7, 2005 Press Release, Immucor admitted that around this time period (one month prior to the Milan investigation) it had "identified some weaknesses in its internal controls."  As early as the November 2, 2004, press release, Immucor publicly stated that, contrary to the present-sense claim of the 10-K filing, it was "taking steps to strengthen financial controls in its European operations."  (November 2, 2004 Press Release.)

A reasonable investor would have been swayed had Immucor identified to the public (as it admits that it identified internally) weaknesses in its internal controls.  These weaknesses could have lead (and Plaintiffs allege did in fact lead) to liability under the FCPA and impacted the value of Immucor's stock.  The Court cannot rule as a matter of law that Immucor's misstatement of those weaknesses was not material.

Plaintiffs allege, and Defendants' later statements acknowledge, that authorities in Milan, Italy launched an investigation that resulted in the arrest of Immucor's chief Italian representative, Guiseppe Straziota, and implicated De Chirico in criminal conduct.  Plainitffs allege that this investigation became the subject of reports by the Italian media in September of 2004.  (Compl. ¶ 6.)

Defendants contend as a general matter that reports in the Italian media on the ongoing investigation caused the omitted information to enter the market such that "defendant's failure to disclose that information itself is immaterial."  In other words, Defendants argue that the facts alleged by Plaintiff to have been omitted became "publicly available" through the Italian media reports, thus rendering any Immucor omissions immaterial.

Although the parties dispute whether the Italian reports were "publicly available," the parties concede that the reports were written in Italian, not readily available in English, and not equivalently reported in the American press.  The nature of these reports casts doubt upon the Defendants' claim that the information contained in them "credibly entered the market" during the class period.  The public availability of the Italian media reports is an issue of fact not appropriate for determination at the motion to dismiss stage.  The Court at present is required only to determine whether Plaintiffs adequately pled securities fraud.

2.    *Statement No. 2--The November 2, 2004 Press Release*

Plaintiffs contend that the press release suffered from a materially misleading omission because it "failed to disclose[] the true nature of Immucor's involvement in criminal activity in Italy."  More specifically, Plaintiffs allege that

-31-

Defendants misrepresented the situation as an "isolated instance of poor record keeping" when it was in fact "serious and extensive criminal activit[y] . . ." (Compl. ¶ 63.)

The press release discloses five principal facts: (1) that Italian authorities were undertaking a <u>criminal</u> investigation of Immucor for "improper cash payments"; (2) that Immucor had launched in internal investigation of its own business practices; (3) that Immucor had violated the FCPA; (4) that the internal investigation had found one incident; (5) that the incident of violation was of sufficient gravity to relieve De Chirico of his responsibilities as CEO; and (6) that Immucor perceived a need to strengthen controls in its European affiliates.

Plaintiffs allege that Defendants failed to disclose that Immucor had in fact made numerous legally questionable payments to various Italian doctors beginning in 1998. To be material, this omission must have both rendered Immucor's previous statement misleading, and have affected the total mix of information considered by a reasonable investor.

The omitted fact renders the statement misleading. The statement creates an impression that the investigation was limited to a single incident of poor bookkeeping by Immucor. The press release presents a picture of an isolated

instance of poor bookkeeping, but Plaintiffs allege that multiple legally dubious payments made by De Chirico or under his direction were being investigated. The omission creates a distorted picture of Immucor's alleged liabilities. That is, while parts of the disclosure may have been accurate, Defendants' duty was to describe fully the nature and scope of the conduct under investigation -- conduct of which De Chirico was fully aware because he participated in it.

The omitted information would have been viewed by a reasonable investor as affecting the total mix of information available, and a reasonable investor's investment decision would have been swayed had the alleged omitted information been included in the press release. While the statement gave notice of an ongoing criminal investigation, a reasonable investor would have been reassured by the November 2, 2004, press release that Immucor was not likely to be liable for a pattern of criminally improper business practices. The alleged fact that Immucor had committed a series of wrongful payments alleged to have been paid by De Chirico or at his direction would have put a reasonable investor on notice that Immucor might be liable not only for bad bookkeeping, but for repeated criminal conduct. While the investigation would put a reasonable investor on notice that additional past violations might be found, the statements alleged to be omitted

would have established that additional violations (and the resulting fines and penalties) were not merely possible, but likely.  The omitted information would have also established that Immucor's internal controls had been ineffective.  The Court concludes that a reasonable investor would be swayed in an investment decision by the disclosure of the allegedly omitted information.

3.    _Statement Number 3--The December 16, 2004 8-K Filing_

Plaintiffs allege that this statement -- essentially the publication of a new company code of ethics -- is false and misleadingly incomplete because "Defendants falsely assured the market that [Immucor] was taking active steps to address its internal control failures arising from criminal investigation in Italy when, in fact, Defendants were continuing to hide the true nature and scope of [Immucor's] involvement in the scandal."  (Compl. ¶ 65.)

The Court finds that this statement was not materially misleading.  On the date of the release of the 8-K, the November 2, 2004 press release was public knowledge.  A reasonable investor would have known that Immucor had admitted to a violation of the FCPA and was under criminal investigation in Italy.

Plaintiffs allege that Immucor through the 8-K sought falsely to assure the market that it was strengthening its internal controls.  The fact, however, is that the

8-K filing accurately described events that had occurred or were occurring.   That Immucor sought to guide the future behavior of its employees is not an actionable misrepresentation of its alleged past conduct.

            4.      *Statement Nos. 4 & 5--the January 7, 2005 Press Release and Analyst Teleconference*

Plaintiffs allege that the press release and statements made during the analyst phone conference were materially misleading because they presented an unreasonably optimistic outlook on the scope and gravity of the Italian investigation as an "isolated event" when representatives of Immucor had in fact committed multiple acts of corruption over a period of years beginning in 1998. (Compl. ¶ 68; 72.)

The Court finds that these statements are materially misleading.  During the phone conference, Gallup asserted that only a single FCPA violation of the type alleged by Plaintiffs to constitute a bribe occurred and that the investigation was close to a positive resolution.  Plaintiffs allege (as the PricewaterhouseCoopers investigation would soon reveal) that at least twenty questionable payments had been made.  Both the press release and the statements made during the phone conference represent that Immucor's problems stem from payments improperly recorded in Immucor's records.  Planitiffs allege that Immucor's impropriety was

not the commission of "bookkeeping errors," but rather the making of payments illegal in themselves.

The analysts with whom Gallup was speaking when making these statements were, as evidenced by their questions, concerned about the number and nature of criminal allegations for which Immucor might face liability.  The questions asked, particularly by Mr. Frohlich, made it clear that the single disclosed violation of the FCPA was "pretty disturbing" to at least one investment analyst.  The clear implication is that a reasonable investor would have found the disclosure of repeated violations, as alleged by Plaintiff, to be disturbing and important.

The number and nature of Immucor's likely FCPA violations formed an important part of the "total mix of information."  If Immucor mislead investors as Plaintiffs allege by misstating the nature and number of its alleged criminal acts during the analyst teleconference and in the press release, those misleading statements were material.

5.      *Statements No. 6 and 7--The January 11 and 14, 2005*
        *10-Q Statements*

Plaintiffs allege that these statements were materially misleading because Defendants "knew, but failed to disclose, the true nature and scope of Immucor's involvement in illegal activity in Italy." (Compl. ¶ 72.)  More specifically, Plaintiffs allege that "Immucor, through De Chirico, had bribed numerous physicians and other public officials for several years in exchange for lucrative contracts . . . ." (Id.)

The 10-Q filing states: (1) that the Italian subsidiary and De Chirico were subject to criminal investigation in Italy; (2) that the investigation "centered on" a well-known physician not employed by Immucor; (3) the investigation concerned alleged improper cash payments in return for contract awards; (4) Immucor's internal investigation did not reveal that its Italian subsidiary made any improper payments to that specific physician; (5) Immucor hired that physician as a convention sponsor and paid him 13,500 EUR; (6) this payment constituted an FCPA bookkeeping violation; (7) Immucor self-reported this violation to the SEC; and (8) the company's internal controls were deemed to be effective currently.

Plaintiffs do not allege that these statements were false.  Immucor and De Chirico were subject to an investigation, the investigation did center on an Italian

physician, the investigation concerned contract-rigging and bribery, Immucor

nominally hired the physician as a convention sponsor and paid him 13,500 EUR,

and that payment constituted an FCPA bookkeeping violation self-reported to the

SEC by Immucor.  Plaintiffs rather allege that Immucor's omission of the other

alleged instances of improper payment was misleading.

        The 10-Q, in light of the total mix of information, admitted the Italian

problems to  the market.  The 10-Q, however, also sought to put a misleadingly

favorable face on the situation by leaving the impression Immucor's potential

liability was limited to negligent bookkeeping practices -- in other words, that

Immucor did not face serious exposure for criminal conduct.  The omission of the

alleged existence of additional legally dubious payments by Immucor renders the

10-Q misleading, especially in light of the Complaint's allegations that many of the

alleged illegal payments were made by or at the direction of De Chirico, a senior

manager in the company.

        The disclosure of the additional legally questionable payments could have

increased Immucor's perceived liability in fines or other penalties, and a

reasonable investor likely would have found the omitted alleged facts relevant to

the total mix of information.  The cautionary language noted by the Defendants

does not discredit this conclusion.  Defendants noted that they could not predict the outcome of the investigation or whether any fines would ensue.  Immucor's cautionary statement may have been true to the extent that Immucor could not predict the outcome of the investigation, but the cautionary statement does not change the fact that Immucor made misleading omissions pertinent to its exposure. The failure to provide a complete picture deprived reasonable investors of knowledge that additional liability was both possible and likely.

Plaintiffs allege that the 12b-25 filing was false and misleading in that it reiterated the statements made in Immucor's January 7, 2000, press release.  The Court previously found the January 7th statements misleading.

6.    Statements Number 7, 8, and 9--April 6 Analyst
       Teleconference and April 8, 2005 10-Q Statement

Plaintiffs allege that these statements were materially false and misleading because "by this time, in addition to the illegal payments [mentioned], the expanded investigation revealed that additional payments were made to numerous other doctors thorough Italy . . . .  According to the investigation . . . Immucor funneled money . . . through its German subsidiary" in furtherance of its criminal activities.  (Id. at ¶ 78.)  Plaintiffs specifically allege that "the Company's internal

investigation [conducted through PricewaterhouseCoopers] revealed that at least 20 of the payments to various physicians were legally doubtful." (Id.)

A reasonable investor would have understood from the series of press releases and analyst phone calls discussing the Italian situation that Immucor had potentially serious issues arising from a significant number of alleged incidents of improper conduct in the Italian subsidiary.  A reasonable investor would have understood from the analyst phone conference that, whatever the Italian subsidiary had actually done, Immucor would be liable for no more than two million dollars in fines and penalties.

The information alleged to have been omitted concerning the scope of Immucor's alleged corruption renders the statements of 10-Q filing and of the analyst teleconference misleading.  The statements made present a picture of isolated clerical errors, limited in scope and anticipated to be resolved by the payment of a monetary penalty.  Plaintiffs allege to the contrary that Immucor omitted facts that would have disclosed numerous instances of alleged criminal conduct with possible consequences extending beyond monetary penalty.

The information alleged to be omitted does not render the statement by Ramsey concerning Immucor's internal controls misleading.  That Ramsey may

have neglected to mention the historical reasons why improvement of the controls was necessary does not render his statement that Immucor was working to improve the controls misleading.

Gallup's phone statement and the 10-Q filing were materially misleading. The information alleged to have been omitted would have given a reasonable investor notice that Immucor was liable not only for up to a $2 million penalty for poor bookkeeping, but also that Immucor faced exposure for criminal liability, which could include consequences beyond a monetary fine, including not least shaken investor confidence and lower stock prices.  Even if Gallup's $2 million estimate was an accurate statement of Immucor's liability for its true actions, a reasonable investor would have considered it important to know that Immucor might be criminally liable, because such liability could have other effects on Immucor's ability to do business, such as debarment, licensing trouble, marketplace credibility and other outcomes capable of affecting the price of Immucor's stock.  The scope and nature of Immucor's alleged criminal conduct would have been important to a reasonable investor, and its omission in the statements above was material.

C.    Scienter

To state a claim for securities fraud under the Exchange Act, a plaintiff must prove scienter, or an intent to defraud.  Plaintiffs must prove that each of the Defendants intended to defraud purchasers and sellers of securities when making the material misrepresentations or omissions alleged.

Under the PSLRA, a securities fraud complaint also must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Although factual allegations may be aggregated to infer scienter, "scienter must be found with respect to each defendant and with respect to each alleged violation. . ."  Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1017-18 (11th Cir. 2004).  "[Section] 10(b) was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201 (1976). The Eleventh Circuit requires:

> [T]he plaintiff must allege particular facts giving rise to a
> strong inference that the defendant acted in a severely
> reckless manner.  Severe recklessness is limited to those
> highly unreasonable omissions or misrepresentations that
> involve not merely simple or even inexcusable
> negligence, but an extreme departure from the standards

> of ordinary care, and that present a danger of misleading
> buyers or sellers which is either known to the defendant
> or is so obvious that the defendant must have been aware
> of it.

Theoharous, 256 F.3d 1219, 1224-25 (11th Cir. 2001) (quotations and citations omitted).

"In order to comply with the heightened pleading requirement of the PSLRA, the amended class action complaint must describe how the defendants acted with severe recklessness in relation to the alleged material misrepresentations and omissions." In re Unicapital Corp. Sec. Litig., 149 F. Supp. 2d 1353, 1371 (S.D.Fla 2001). Because "conclusory allegations do not satisfy the pleading requirements of Rule 9(b), the complaint must provide a factual basis for allegations of scienter." In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d at 894 (quotation omitted). Although the PSLRA demands more particularized pleading, the Court on a motion to dismiss must still view all allegations in the light most favorable to the plaintiff. See Fed. R. Civ. P. 12(b)(6). "[A] showing of mere motive and opportunity is insufficient to plead scienter." Bryant, 187 F.3d at 1287. Because the Court ruled certain of the Plaintiffs allegations are not material, the Court will not include them in the scienter analysis.

-43-

1.    *Evidence of Scienter*

Plaintiffs offer direct evidence of scienter with respect to Defendant De Chirico.  Plaintiffs allege that De Chirico orchestrated the alleged improper payments that underlie Plaintiffs' claims, and that De Chirico had direct input on the contents of the allegedly misleading statements.

Specifically, Plaintiffs allege that De Chirico oversaw and was directly involved in the widespread corrupt practices alleged of the Italian subsidiary. Plaintiffs allege the De Chirico attested in the August 26, 2004 10-K filing that Immucor had committed, at most, an isolated violation of the FCPA bookkeeping regulations.  De Chirico also participated in the analyst teleconference on January 7, 2005, in which similar statements were made by Gallup and Ramsey. Plaintiffs have alleged adequately that De Chirico knew that the statements to which he attested were false or misleading.  Accordingly, Plaintiffs have alleged that De Chirico had actual knowledge that the statements that he made or for which he was in part responsible were false or misleading.  Defendants do not dispute the scienter element with respect to De Chirico.  Because De Chirico at all relevant times was President of Immucor, Plaintiffs have also pled scienter adequately with respect to Immucor.

-44-

Plaintiffs have not alleged that Gallup had direct knowledge of the alleged conduct. Their allegations of scienter are based on inference. Plaintiffs principal argument is that Gallup's association with De Chirico, his attentive monitoring of the Milan investigation, and his position of authority within Immucor give rise to a strong inference that Gallup knew about or acted with severe recklessness regarding the false or misleading nature of his statements concerning Immucor's alleged problems with corruption.[8]

---

[8] Plaintiffs also allege that Gallup engaged in suspicious securities trading. "Insider sales may contribute to an inference of scienter where a plaintiff can show that the trading activity was unusual." In re AFC Ent., Inc. Sec. Lit., 348 F. Supp. 2d 1363, 1374 (N.D. Ga. 2004). Trading is unusual when "it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information." Id.

Defendants note that Gallup's sales of Immucor stock proceeded pursuant to a Rule 10b5-1 plan announced in October of 2003, amended and resumed in August of 2004. A valid 10b5-1 plan serves as an affirmative defense to allegations of insider trading. Moreover, the 10b5-1 plan here required Gallup to sell his stock at certain prescribed intervals and in certain prescribed amounts. This, on its face, does not appear to be the kind of behavior evidencing that Gallup was trying to benefit personally from trades made based on inside information.

The Court does not hold that securities trading pursuant to a Rule 10b5-1 plan can never give rise to a strong inference of scienter. The Court acknowledges the possibility that a clever insider might "maximize" their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan. In the present case, however, Plaintiffs have failed to allege any facts that, if true, would show any unusual benefit to Gallup from the stock sales alleged. The Court does not accord any weight to these stock sales for the purpose of determining the adequacy of pleading Gallup's scienter.

Plaintiffs claim that Gallup and De Chirico consulted regularly, including during monthly "Management Review" meetings (Compl. ¶¶ 34-36), and that Immucor held a "special meeting" on the Italian situation, at which De Chirico and Gallup served as presenters.  (Id. ¶ 55.)  Plaintiffs allege that Gallup hand-picked De Chirico as his successor for the position of CEO (Id. ¶ 32), that Gallup knew that Straziota had been arrested for bribery, and that Gallup knew the substance of reports from the Italian media, which allegedly cast Immucor's practices in a very serious light.  (Plaintiff's Opp. to Def. Mot. to Dismiss at 21.)

Plaintiffs next allege that Gallup misrepresented in the April 16, 2004, 10-K filing, the November 2, 2004 press release, and the January 7, 2005 press release and analyst conference call that Immucor's problems in Italy were bookkeeping errors, and that the 13,500 EUR payment was an isolated incident.

To plead scienter adequately for Gallup, Plaintiffs must show that the facts pled, taken as a whole, give rise to a strong inference that Gallup knew or acted with severe recklessness regarding the misleading nature of the alleged material statements.  In other words, Plaintiffs must show that Gallup departed from the standards of ordinary care by making a false statement or by omitting important material information which rendered his statements misleading.

-46-

The Court must at this stage of the litigation take the Plaintiffs' allegations as true.  The Court finds that Plaintiffs have alleged facts which, in their totality, raise (albeit barely) a strong inference that Gallup acted with severe recklessness. Gallup was at all relevant times Chairman of the Board, and for much of the class period served as Immucor's CEO.  Knowledge of facts relating to the core functions of a company can be imputed to a company's key officers.  See In re Friedman's Sec. Lit., 385 F. Supp. 2d 1345, 1363-64 (N.D. Ga. 2005).  That Gallup never disclosed the full scope of the Italian situation, even after it is apparent that he knew of its scope and gravity, lends strength to the inference that Gallup intentionally or recklessly withheld from investors a full and fair statement of the problems in Italy and their possible consequences.  Plaintiffs have succeeded in pleading allegations that, taken as true, raise a strong inference that Gallup had the requisite scienter.

> C.   Loss Causation

Defendants claim in their Motion to Dismiss that Plaintiffs have not sufficiently pled causation.  Defendants allege that, while Plaintiffs have alleged that they bought Immucor stock at an inflated price, Plaintiffs failed to "link disclosure of the alleged Italy omissions to the alleged fall in stock price."  (Def.

Mot. to Dismiss at 18.)

Plaintiffs in securities fraud cases must plead and eventually prove both "transaction causation" and "loss causation."  Rogers v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir. 1997).  "Transaction causation" is "another way of describing reliance. . ."  Id.  "Loss causation" is proved when the misstatements or omissions are shown to constitute "the proximate reason for [Plaintiffs'] pecuniary loss. . ."  Id.  In other words, "loss causation describes the link between the defendant's misconduct and the plaintiff's economic loss."  Id.  (quotation omitted).  Loss causation does not require a showing that the alleged misstatements were the sole cause of loss; however, Plaintiffs must allege adequately that the material misstatements or omissions were a "significant contributing cause" to the loss.  Id. (quotation omitted).

Allegations that misrepresentations inflated the value of a stock, without more, are insufficient to plead loss causation.  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005) ("as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value.") (emphasis in original).

-48-

The Supreme Court has held that the alleged loss must have more than a marginal connection to the misrepresentation.  "To 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires."  Id. at 343. (emphasis in original).  Dura Pharm suggests that the proper time-frame in which to examine whether a misrepresentation caused a loss is "after the truth makes its way into the marketplace."  Id. at 342.

To survive a motion to dismiss, a proper complaint must allege adequately both types of causation.  Unlike the pleading standard for materiality or scienter, the pleading standard for loss causation in securities fraud cases does not impose "any special . . . requirement. . ."  Id. at 346.  Plaintiffs must, consistent with Rule 8 of the Federal Rules of Civil Procedure, provide only a "short and plain" statement adequate to give defendants "some indication of the loss and the causal connection that the plaintiff has in mind."  Id. at 347.

Defendants do not contend that Plaintiffs have not alleged adequately transaction causation.  Plaintiffs plead a "fraud on the market" type case.  In such cases, Plaintiffs reliance on the alleged misstatements or omissions is presumed once such statements are made public.  See Basic v. Levinson, 485 U.S. 224, 242-44 (1988).

Defendants contend that Plaintiffs have not shown "loss causation," or any link between the Plaintiff's claimed revelation of the "truth" to the market and a drop in Immucor's stock prices.  Plaintiffs allege that the announcement of a formal SEC investigation on August 26, 2005 uncovered the truth concerning the scope and gravity of Immucor's corrupt practices to light.  Plaintiffs note that on August 29, 2005, Immucor further announced the resignation of CFO Ramsey and a downward revision in third and fourth quarter net income due to unrecorded accrual for employee bonuses.  Plaintiffs allege that this series of negative pronouncements resulted in a 17% drop in Immucor stock prices.

Defendants contend, "it was the second announcement -- relating to the third- and fourth- quarter earning -- that triggered the drop in price, not the first announcement relating to the SEC investigation."  (Def. Brief in Support of Mot. to Dismiss at 21.)  Defendants further note, "The August 26 announcement regarding the SEC investigation neither revealed the previously-omitted information Plaintiffs cite nor cause[d] the drop in stock price Plaintiff's complain of . . ."  (Id.)

Defendants argue that the August 26, 2005 revelation of a formal SEC investigation did not amount to a disclosure of the "true truth" to the market. Defendants claim that actual disclosure of improper payments to another physician

did not become available until months later, in October, 2005.  (Def. Reply Brief in Support of Mot. to Dismiss at 9.)

Because allegations of loss causation should be evaluated under the notice pleading standard Rule 8 of the Federal Rules, the Court finds that Plaintiffs have pled loss causation adequately.  Plaintiffs' Amended Complaint gives Defendants notice of both the loss alleged -- a 17% drop in Immucor stock prices -- and the causal nexus -- the 17% drop followed closely after an announcement of a formal SEC investigation, alleged by Plaintiffs to be the disclosure of the relevant truth to the market.  Even though loss causation may be difficult for Plaintiffs to prove, the Court finds the Amended Complaint provides Defendants with sufficient notice of Plainitffs claims to meet the minimal pleading standard of Federal Rule of Civil Procedure 8.

C.   Control Person Claims

Defendants move to dismiss the control person claims, under Section 20 of the Exchange Act on the basis that Plaintiffs have failed to plead an underlying violation.  In light of the preceding discussion, Plaintiffs have pled adequately an underlying violation and have pled that Gallup and De Chirico were "control persons" within the meaning of the statute.  Accordingly Plaintiffs have pled

adequately a Section 20 claim.

## IV.  <u>CONCLUSION</u>

Plaintiffs have stated allegations adequate under Federal Rule of Civil

Procedure 9(b) and the PLRA material misstatements by Immucor, scienter as to

Immucor, De Chirico, and Gallup, and loss causation.

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [15] is

**DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Stay Discovery

[24] is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Lead Plaintiffs' Motion for Leave to file

a Surreply Memorandum [28] is **GRANTED**.

**SO ORDERED**, this 4th day of October, 2006.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE