UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____ )
                                )
IN RE IMMUCOR, INC.             )   CIVIL ACTION
SECURITIES LITIGATION           )   NO. 1:05-CV-2276-WSD
_____ )

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS

## I.    PRELIMINARY STATEMENT

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs respectfully submit this memorandum in support of their motion for final approval of the settlement of this class action for a total of $2.5 million in cash and approval of the Plan of Allocation of settlement proceeds.[1]  The terms of the settlement are set forth in the Stipulation of Settlement dated as of May 14, 2007 ("Stipulation"), which was previously submitted to the Court.  The settlement is the result of arm's-length negotiations between counsel experienced in class action securities litigation with the

---

[1]    All capitalized terms not defined herein shall have the same meaning as set forth in the Stipulation of Settlement dated as of May 14, 2007.

substantial assistance of the Honorable Herbert Stettin (Ret.), a highly respected former judge with substantial experience in the mediation of complex class actions. Lead Counsel firmly believe that the settlement is a very good result and clearly in the best interests of the Members of the Class.

This case was carefully investigated and has been vigorously litigated since its commencement. During the course of the Litigation, Lead Counsel (1) reviewed and analyzed voluminous publicly filed documents, financial reports, analysts' reports and press releases concerning Immucor, Inc. ("Immucor" or the "Company"); (2) located and interviewed numerous potential witnesses, including former Immucor employees; (3) consulted with a damages expert; (4) thoroughly researched the law pertinent to the claims and defenses asserted; (5) retained counsel in Italy to monitor the criminal proceedings involving Defendants; (6) successfully opposed (in the main) Defendants' motion to dismiss; (7) filed a motion for class certification; (8) reviewed and analyzed tens of thousands of pages of documents produced by Defendants; and (9) engaged in arm's-length negotiations with Defendants to settle the case.[2]

---

[2]    The Court is respectfully referred to the Declaration of Meryl W. Edelstein in Support of Proposed Settlement, Plan of Allocation and Application for Award of Plaintiffs' Attorneys' Fees and Reimbursement of Expenses ("Edelstein Declaration") for a more detailed description of the history of the Litigation, Lead Counsel's efforts

2

The settlement is the product of extensive investigation, aggressive litigation and arm's-length negotiations and takes into account the significant risks specific to this case. It was negotiated by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses. Lead Counsel, who are well-respected and experienced in prosecuting securities class actions, have concluded that the settlement is an excellent result under the circumstances and is clearly in the best interest of the Class. This conclusion is based on all the circumstances present here, including a complete analysis of the evidence, the substantial risks, expense and uncertainties in continuing the Litigation, the relative strengths and weaknesses of the claims and defenses asserted, the legal and factual issues presented, past experience in litigating complex actions similar to the present action and the serious disputes among the parties concerning the merits and damages.

Members of the Class appear to overwhelmingly agree with Lead Counsel's conclusion. Pursuant to the Notice Order, over 37,800 copies of the Notice of Pendency and Proposed Settlement of Class Action (the "Notice") were mailed to

---

in the prosecution of this Litigation and the factors bearing on the reasonableness of the settlement and Plan of Allocation of settlement proceeds.

Members of the Class.  In addition, the Summary Notice was published in the national edition of *Investor's Business Daily*.[3]  The Court requested that written objections to the settlement and Plan of Allocation be filed and served on counsel by August 30, 2007.  To date, only one Class Member has filed an objection and that objection relates only to the Plan of Allocation and, as discussed below, should be overruled.[4] The lack of objection is compelling evidence that the Members of the Class overwhelmingly support the reasonableness of the settlement and the Plan of Allocation.

For all of the reasons discussed herein and in the Edelstein Declaration, it is respectively submitted that the settlement is an excellent result for the Class and should be approved by the Court.  Moreover, the Plan of Allocation of settlement proceeds was developed by Lead Plaintiffs' damage expert, tracks the theory of damages asserted and is fair, reasonable and adequate.

---

[3]     *See* paragraphs 3-8 of the Declaration of Carole K. Sylvester Re: A) Mailing of the Notice of Pendency and Proposed Settlement of Class Action and the Proof of Claim and Release Form and B) Publication of the Summary Notice, submitted herewith.

[4]     In addition, only two requests for exclusion have been received by the Claims Administrator.

## II. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, AND SHOULD BE APPROVED

### A. The Applicable Standards

As a matter of public policy, courts, including the Eleventh Circuit, favor the settlement of disputed claims, particularly settlements of class actions and shareholder litigation. *In re United States Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("[p]ublic policy strongly favors the pretrial settlement of class action lawsuits"); *See also Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910). "[S]ettlements [of class actions] are 'highly favored in the law and will be upheld whenever possible.'" *Bennett v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D. Fla. 1982), *aff'd* 737 F.2d 982 (11th Cir. 1984) (citation omitted).

Under Federal Rule of Civil Procedure 23 ("Rule 23"), a class action settlement should be approved where, as here, the settlement: (1) was not the product of fraud or collusion, and (2) is "fair, reasonable, and adequate." *See* Rule 23(e)(1)(C); *Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th Cir. 1985); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *see also In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000).

In assessing the fairness, reasonableness and adequacy of a class settlement, the Eleventh Circuit has established several factors that courts may consider, including: the likelihood of success at trial; the range of possible recovery; the point on or below

the range of possible recovery at which a settlement is fair, adequate, and reasonable; the complexity, expense, and duration of litigation; the substance and amount of opposition to the settlement; and the stage of proceedings at which the settlement was achieved. *Bennett*, 737 F.2d at 986. Courts have emphasized, however, that these factors should not be applied in a "formalistic" fashion. *See Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 140 (W.D. Ky. 1992).

In considering these factors, courts have been admonished not to decide the merits of a case or to resolve unsettled legal questions. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). A court should also hesitate to substitute its own judgment for the judgment of the litigants and their counsel. *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 315 (7th Cir. 1980) ("Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel."). Finally, "[a] strong presumption of fairness attaches to a settlement agreement when it is the result of this type of [arm's-length] negotiation." *In re Harnischfeger Indus., Inc.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002). Here, the settlement was negotiated at arm's length between Lead Counsel and counsel for Defendants, with the assistance of Judge Stettin. The attorneys who conducted the negotiation for the Class are among the most highly regarded in the country, have many years of experience in conducting complex securities litigation, and were

6

thoroughly conversant with the strengths and weaknesses of the case. Counsel's decision, therefore, should be given great deference. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993) ("[i]n determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel").

As explained below and in the Edelstein Declaration, when examined under the applicable criteria, this settlement is an excellent result for the Class and should be approved by the Court.

## B.    The Settlement Satisfies the Criteria for Approval

### 1.    The Settlement Was Achieved Through Arm's-Length Negotiations

Courts often focus on whether the settlement resulted from "arms length negotiations" between counsel possessed of "experience and ability . . . necessary to effective representation of the class's interests." *See Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982). As the court stated in *South Carolina Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991), absent collusion, a court should give significant weight to the judgment of counsel:

> The negotiations in this case were conducted by able counsel who have a substantial amount of litigation experience in this sort of complex securities action. Finding no indication of any collusion, it is therefore appropriate for the court to give significant weight to the judgment of

7

> class counsel that the proposed settlement is in the interest of their clients and the class as a whole.

*See also Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 539 (S.D. Fla. 1988), *aff'd* 899 F.2d 21 (11th Cir. 1990) (a court "can rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel'") (quoting *Cotton*, 559 F.2d at 1330).

The settlement in this litigation was reached only after hard-fought arm's-length negotiations among counsel for the parties with the substantial assistance of Judge Stettin. Although great progress was made at the February 28, 2007 formal mediation, an agreement-in-principle was only reached after several telephone calls facilitated by Judge Stettin in the weeks following the mediation. Thereafter, the parties continued to negotiate over the specific terms of the settlement until the Stipulation was executed.[5] As such, the settlement enjoys a presumption that it was reached without collusion and is fair, adequate and reasonable. *See Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501-02 (E.D. Va. 1995) ("[T]he Court is persuaded that Plaintiffs' counsel, with their wealth of experience and knowledge in the

---

[5] "The conclusion that the parties did not collude in arriving at a settlement involves a negative analysis: whether there is any reason to believe otherwise." *Domestic Air*, 148 F.R.D. at 313. Here, there is nothing to suggest fraud or collusion in the settlement process.

securities-class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class.").

### 2. Lead Plaintiffs' Success at Trial Would Be Far from Assured

One of the factors courts consider in approving a class action settlement is the likelihood of success on the merits balanced against the relief offered in settlement. *Whitford*, 147 F.R.D. at 140. The principal claims in this Litigation are based upon §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. While Lead Counsel believe that they could prove the claims asserted, there is nevertheless a great deal of risk present and there was certainly no guarantees that they would prevail at trial and ultimately collect on a larger judgment after trial and subsequent appeals. Post-Private Securities Litigation Reform Act of 1995 ("PSLRA") rulings make it clear that the risk of no recovery has increased exponentially since the PSLRA was adopted in 1995.[6]

---

[6]    *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (acknowledging that "securities actions have become more difficult from a plaintiff's prospective in the wake of the PSLRA"). In addition, the court in *Ikon* went on to indicate a number of additional factors that have made litigation of securities class actions more difficult. "The Act imposes many new procedural hurdles, including restrictions on the types of plaintiffs who may serve as representatives and requiring increased court intervention in the selection of lead counsel. It also substantially alters the legal standards applied to securities fraud

Securities litigation generally involves complex issues of fact and law, and this case is no exception. In order to establish liability under §10(b), Lead Plaintiffs would bear the burden of proving, *inter alia*, that Defendants participated in the public dissemination of false or misleading information, that the information was material to investors in determining whether to invest in Immucor's common stock, that the information impacted the market price of the common stock, caused damage to the Class and that Defendants acted with scienter. *See Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir. 2001).

Lead Plaintiffs' case centered on public statements made by Defendants during the Class Period concerning the scope and gravity of potential Foreign Corrupt Practices Act ("FCPA") violations by Immucor's Italian subsidiary. While Lead Plaintiffs and their counsel believe the claims asserted have substantial merit and that they would be able to prove that Defendants' statements alleged to be false were in fact material misstatements or omissions made with scienter, establishing liability at trial would by no means be guaranteed. Defendants have denied any culpability

---

claims in ways that generally benefit defendants rather than plaintiffs." *Id*. at 194-95 (citation omitted).

throughout the litigation and have asserted defenses that create risks to the Class if litigation continued.

First, Defendants would continue to argue, as they did in their motion to dismiss, that the alleged misstatements and/or omissions were immaterial because throughout the Class Period, the Company kept the market informed regarding the FCPA violations by its Italian subsidiary and the impact on Immucor's business. Defendants would also argue that certain facts alleged by Lead Plaintiffs to have been omitted became publicly available through Italian media reports thus rendering any omissions immaterial.  Defendants would also likely point to two reports prepared at the request of the Company by the law firm of Sutherland Asbill & Brennan that detailed the results of its investigation into the fraud at Immucor's Italian subsidiary to absolve them of liability.  Defendants would argue that the reports indicate that there were fewer illegal payments than had been reported by the Italian press and alleged in the Complaint, and that some of these payments were legitimate.  At minimum, Lead Plaintiffs and Defendants would disagree on the meaning and import of the two reports as well as many of the documents underlying these reports.

There was also no certainty that additional discovery would tend to support or disprove Lead Plaintiffs' allegations.  Lead Plaintiffs' ability to conduct discovery would be hampered by the fact that the underlying conduct occurred in Italy.  Thus,

11

Lead Plaintiffs would have faced unique challenges that do not exist in ordinary securities fraud actions. For example, Italian law does not permit parties to submit requests for pre-trial discovery of documents. In addition, the process for obtaining deposition testimony in Italy is onerous, expensive and time-consuming.

At trial, Defendants would present evidence in support of their contentions that there were no material misstatements or omissions, that they had a reasonable good-faith belief in their actions at the time and that they did not act with scienter. Thus, Lead Plaintiffs would face the risk of establishing liability posed by conflicting evidence and testimony. Lead Plaintiffs faced the real risk that the jury would find that some or all of the alleged misrepresentations and omissions were not material, that Defendants acted in good faith and without the mental state necessary to satisfy the scienter requirement.

If Lead Plaintiffs were successful in proving liability, one of the other major issues and risks going forward would have been Lead Plaintiffs' ability to prove loss causation and damages. During settlement negotiations, Defendants made it clear their primary defense would be that Lead Plaintiffs could not prove loss causation and thus could not show that they suffered any compensable damages under §10(b). The Court's Order on Defendants' motion to dismiss recognized that "loss causation may be difficult for Plaintiffs to prove." *See* Motion to Dismiss Order at 51.

Defendants would continue to argue that the August 26, 2005 revelation of a formal SEC investigation resulted in a momentary stock price drop of $.04 per share, after which the price returned to its previous level. Although the stock trended downward by $.67 per share by the end of the day, Defendants argued that the failure of the price to decline immediately in response to the disclosure of the SEC investigation demonstrates the absence of loss causation. Moreover, Defendants would further argue that it was only when the Company announced after the close of business on August 29, 2005, that its CFO was resigning and it would be issuing a small restatement relating to a bonus accrual that the stock dropped by any significant amount.

Causation is a particularly difficult issue in securities cases under the Eleventh Circuit's decision in *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997), which reversed a jury verdict against an accounting firm. *Koger* held that the plaintiff had failed to establish loss causation, the connection between the ultimate decline in the corporation's stock price and the accounting firm's alleged misrepresentations as to the company's financial condition. This analysis was recently reiterated by the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346-47 (2005).

The determination of loss causation and damages is a complicated and uncertain process involving conflicting expert testimony. Expert testimony could rest on many subjective assumptions, any of which could be rejected by a jury as speculative or unreliable. Lead Plaintiffs would have likely faced a motion *in limine* by Defendants to preclude Lead Plaintiffs' damage experts' testimony under the *Daubert* test and risked a decision that a damage model might not be admissible in evidence. Moreover, at trial, the loss causation and damage assessments of Lead Plaintiffs' and Defendants' experts were sure to vary substantially, and in the end, this crucial element at trial would be reduced to a "battle of experts." The reaction of a jury to such expert testimony is highly unpredictable and "in such a battle, [Lead] Counsel recognize the possibility that a jury could be swayed by experts for the Defendants," and find that there were no damages or only a fraction of the amount of damages Lead Plaintiffs' contended. *See In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001).

### 3. Lead Plaintiffs Have Negotiated for a Substantial Recovery

One of the factors outlined in *Bennett* is the consideration of the range of possible recovery and the point in that range at which a settlement "is fair, reasonable and adequate" and is not the product of collusion between the parties. 737 F.2d at 986. As the Eleventh Circuit has recognized, no set formula exists to determine where

14

that point lies, "'a just result is often no more than an arbitrary point between competing notions of reasonableness.'"  *Id*. at 987 (citation omitted).  Indeed, "in any case[,] there is a range of reasonableness with respect to a settlement."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).[7]  In any event, the range of possible recovery must be weighed against the likelihood of recovery.

The settlement provides for a cash payment of $2.5 million that will provide an immediate and certain recovery for Members of the Class.  In contrast, continued litigation would be uncertain, costly and time-consuming, and leave the Class with the very real risk that they would recover nothing.  As discussed, even if Lead Plaintiffs were able to establish liability, the amount of provable damages was very much in doubt.  Lead Plaintiffs' experts performed a preliminary damage analysis indicating that provable damages in this case were $14.9 million.

Lead Counsel, who are well-respected and experienced in prosecuting securities class actions, considered the substantial risks, expense and uncertainties in continuing

---

[7]   Courts have noted that:

> The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement . . . should be disapproved.

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974).

the Litigation through summary judgment, trial and probable additional appeals, the

relative strengths and weaknesses of the claims and defenses asserted, the evidence

obtained, the legal and factual issues presented, and the serious disputes between the

parties concerning the merits and damages before entering into the settlement.  As

such, after weighing the settlement amount against "the risks and costs of continued

litigation," this Court should find that the settlement is "well within the range of

possible recoveries and should be approved."  *Motorsports*, 112 F. Supp. 2d at 1334.

### 4.    The Complexity, Expense and Duration of Further Litigation

Securities class actions are extremely complex, time consuming and expensive.

Courts have repeatedly noted that "'[s]tockholder litigation is notably difficult and

notoriously uncertain.'"  *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp.

525, 529 (E.D. Pa. 1990) (citation omitted).  Indeed, courts have recognized that

"securities actions have become more difficult from a plaintiff's perspective in the

wake of the PSLRA."  *Ikon*, 194 F.R.D. at 194.

There is no question that this case involves complex factual and legal issues and

if not for this settlement, the case would have continued to be fiercely contested by all

parties.  Defendants have demonstrated a commitment to defend the case through and

beyond trial, if necessary, and are represented by well-respected and extremely

capable counsel.

16

If this case were tried rather than settled, the parties would have to continue and complete a lengthy, extensive, and time-consuming discovery program involving a review and analysis of additional documents, likely numbering in the hundreds of thousands of pages, from Immucor and third parties. As discussed above, discovery in this case would be complicated by the fact that the underlying conduct occurred in Italy. Lead Plaintiffs would also have to undertake an extensive deposition program, including the depositions of Immucor's senior management, employees, former employees, employees of the Italian subsidiary, and the individual defendants, as well as third parties. The parties would also have to conduct expert discovery, involving both the preparation of experts' reports and the depositions of the various experts. Trial of this matter would take several weeks and consume considerable judicial and financial resources. Additionally, even if the Lead Plaintiffs could recover a larger judgment after trial, the additional delay, through trial, post-trial motions, and the appellate process, could last for years.

No matter what the outcome of trial, appeals would likely be taken to the Eleventh Circuit Court of Appeals and perhaps even to the United States Supreme Court. Even very large judgments, recovered after a lengthy trial, have been

completely lost on appeal or as a result of a judgment notwithstanding the verdict. [8]

All of the foregoing would have further extended the case and delayed the ability of the Class to recover for years, if at all.  Moreover, even if Lead Plaintiffs were successful at trial there was no certainty that a larger judgment entered several years from now would be collectible.

All of the above practical considerations weigh strongly in favor of approval of the settlement.  "[T]he very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  The settlement secures a substantial benefit for the Members of the Class, undiminished by further litigation expenses and without the attendant delay, risk and uncertainty of continued litigation.

---

[8]    *See*, *e.g.*, *Robbins*, 116 F.3d 1441 (reversing $81.3 million jury verdict for plaintiff after almost 7 years of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (multi-million dollar judgment for plaintiffs reversed on appeal after 11 years of litigation); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning, on the basis of 1994 Supreme Court opinion, jury verdict rendered at trial in 1988 for case filed in 1973); *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544 (3d Cir. 1996) (in ERISA class action, Third Circuit reversed judgment for plaintiffs in bench trial and entered judgment for all defendants on all counts); *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606 (5th Cir. 1996) (reversing verdict for plaintiffs on negligent misrepresentation claim against defendant auditor and dismissing claim).

### 5.     Reaction of the Class Supports Approval

"[T]he reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."  *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989).  The Notice informed Class Members that the Court requests that written objections be filed and served on or before August 30, 2007.  To date, out of the entire mailing of over 37,800 individual Notices to potential Members of the Class and their nominees and publication of the Summary Notice in the national edition of *Investor's Business Daily*, not a single Member of the Class has objected to the settlement and only one Member of the Class has objected to the Plan of Allocation of settlement proceeds.  The overwhelming approval by the Members of the Class is an important factor in evaluating the fairness, reasonableness and adequacy of the settlement and supports approval by this Court.[9]

---

[9]     *See Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) ("The attitude of the members of the class, as expressed directly or by failure to object, after notice, to the settlement, is a proper consideration for the trial court, though 'a settlement is not unfair or unreasonable simply because a large number of class members oppose it.'") (citations omitted).

6.     **The Stage of the Proceedings Favors Approval of the Proposed Settlement**

The purpose of considering the stage of the proceedings is to ensure that plaintiffs have had access to sufficient information to evaluate the case and to determine the adequacy of the settlement. *Behrens*, 118 F.R.D. at 544. Here, both the knowledge of Lead Plaintiffs and their counsel and the proceedings themselves have reached a stage where an intelligent evaluation of the Litigation and the propriety of settlement can be made.

Lead Plaintiffs' counsel were able to conduct significant informal discovery and investigation through witness interviews on the matters alleged. During this investigation, Lead Plaintiffs' counsel identified and interviewed former Immucor employees and third parties with information relevant to Lead Plaintiffs' claims, reviewed and analyzed all publicly available information regarding Immucor and conferred with consultants with expertise in damages, loss causation and materiality. Additionally, the settlement was reached after the parties had fully briefed Defendants' motion to dismiss and the Court issued its order on Defendants' motion. Lead Plaintiffs' counsel also reviewed approximately 70,000 pages of documents produced by Defendants. The parties also participated in hard-fought settlement negotiations, including a mediation with the Honorable Herbert M. Stettin, where the strengths and weaknesses of Lead Plaintiffs' claims were extensively debated.

20

As a result, Lead Plaintiffs and their counsel had a clear picture of the strengths and weaknesses of their case and of the legal and factual defenses that Defendants would assert throughout the litigation. Having sufficient information to properly evaluate the case, Lead Plaintiffs' counsel have managed to settle the Litigation on terms very favorable to the Class.

## III.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

Approval of a plan of allocation of settlement proceeds in a class action under Rule 23 is "governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 U.S. Dist. LEXIS 21593, at *3 (N.D. Cal. June 16, 1994). An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel. *White v. NFL*, 822 F. Supp. 1389, 1420-24 (D. Minn. 1993); *see also Oracle*, 1994 U.S. Dist. LEXIS 21593, at *3 ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.").

Here, the Plan of Allocation, set forth in the Notice, was formulated by Lead Plaintiffs' counsel with the assistance of their damages experts and distributes the settlement proceeds to those Class Members who suffered economic losses as a result

of the alleged fraud, as opposed to losses caused by market, industry or other non-fraud Company specific factors.  A claim will be calculated as follows:

1.    For shares of Immucor common stock purchased on August 16, 2004 through August 25, 2005, and

(a)    sold prior to August 26, 2005 the claim per share is $0;

(b)    sold from August 26, 2005 through August 29, 2005, the claim per share is the lesser of: (i) the Purchase Price less the Sales Price, or (ii) $0.67 (August 26, 2005 price decline);

(c)    retained at the end of August 29, 2005, the claim per share is the lesser of: (i) the Purchase Price less $16.00 (August 30, 2005 closing price), or (ii) $3.03 (August 26, 2005 and August 30, 2005 price declines).

2.    For shares of Immucor common stock that were purchased on August 26, 2005 through August 29, 2005, and

(a)    sold prior to August 30, 2005, the claim per share is $0;

(b)    retained at the end of August 29, 2005, the claim per share is the lesser of: (i) the Purchase Price less $16.00 (August 30, 2005 Closing Price), or $2.36 (August 30, 2005 Price Decline).

The Plan of Allocation provides for recovery based on the decline in Immucor's stock price that resulted from the Company's August 26, 2005 disclosure that the SEC

had initiated a formal order of investigation into charges that Immucor engaged in bribery and the continued decline in Immucor's stock price through the Company's August 29, 2005 announcement of a downward revision of net income and resignation of its CFO. This is the theory of damages plead in the Complaint and one that would have been pursued if the case continued to trial.

One Class Member, Mr. DiPiero, objects to the Plan of Allocation. Mr. DiPiero wants to know why he is not entitled to recovery for his loss resulting from his purchase of Immucor common stock on June 15, 2005, and subsequent sale on June 16, 2005.[10] Mr. DiPiero's alleged loss was not caused by disclosure of the alleged fraud but instead was caused by other factors unrelated to the fraud. In order to suffer a compensable loss under the claims alleged in the Litigation, "a plaintiff must show

_____

[10]    Mr. DiPiero claims to have purchased 300 shares of Immucor common stock on June 15, 2005 at a price of $35.45 per share and sold those shares for $33.51, the next day on June 16, 2005. Counsel believe that Mr. DiPiero is mistaken on his purchase and sale dates. There was no significant price decline in Immucor common stock on June 16, 2005 and Immucor's stock price, according to Bloomberg and other financial websites, were not in the range of prices that Mr. DiPiero claimed to have purchased and sold his shares. Counsel believe that Mr. DiPiero may have purchased his shares on June 10, 2005 and sold his shares on June 13, 2005. On June 13, 2005, Immucor's share price declined at least in part due to an analyst report issued by Robert W. Baird & Co. which lowered the rating on the stock to "neutral" from "outperform" based on the analyst's view that Immucor would not be able to continue its current gains because of an accounting change that would slow revenue growth.

'that the untruth was in some reasonably direct, or proximate, way responsible for his loss.'" *Robbins*, 116 F.3d at 1447 (citation omitted)  Here, the Plan of Allocation provides recovery for Class Members who suffered losses as a result of the alleged fraud as opposed to other factors including general market losses.  Because Mr. DiPiero did not suffer a loss as a result of Defendants' alleged fraud, his objection should be overruled.

## IV.    CONCLUSION

For all the reasons discussed herein and in the Edelstein Declaration, Lead Plaintiffs respectfully request that the Court approve the settlement of this Litigation and the Plan of Allocation of settlement proceeds as fair, reasonable and adequate.

Respectfully submitted this 12th day of September, 2007.

**CHITWOOD HARLEY HARNES LLP**

By:   s/ Meryl W. Edelstein
Martin D. Chitwood, Ga. Bar No. 124950
Gregory E. Keller, *Admitted Pro Hac Vice*
Meryl W. Edelstein, Ga. Bar No. 238919
2300 Promenade II
1230 Peachtree Street, NE
Atlanta, GA 30309
Tel:  (404) 873-3900
Fax:  (404) 876-4476
E-mail:  MEdelstein@chitwoodlaw.com
E-mail:  MChitwood@chitwoodlaw.com
E-mail:  GKeller@chitwoodlaw.com

**COUGHLIN STOIA GELLER**

24

**RUDMAN & ROBBINS, LLP**
Jack Reise
Douglas Wilens
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel:  (561) 750-3000
Fax:  (561) 750-3364

**COUGHLIN STOIA GELLER**
    **RUDMAN & ROBBINS LLP**
Jeffrey D. Light
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  (619) 231-1058
Fax:  (619) 231-7423

 Co-Lead Counsel for Lead Plaintiffs

## **<u>Local Rule 7.1D Certification</u>**

Counsel for Plaintiffs hereby certify that the text of this Memorandum of Law has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court in Local Rule 5.1B.


s/ Meryl W. Edelstein
_____
Meryl W. Edelstein
Georgia Bar No. 238919
**CHITWOOD HARLEY HARNES LLP**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have on this day serve a true and correct copy of the

within and foregoing **"LEAD PLAINTIFFS' MEMORANDUM OF LAW IN**

**SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND**

**PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS"** with the Clerk of

the Court using the CM/ECF system which will automatically send email

notification of such filing to the following attorneys of record:

Jeffrey O. Bramlett
Corey F. Hirokawa
Tiana S. Mykkeltvedt
**BONDURANT, MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309

This 12th day of September, 2007.

   s/  Meryl W. Edelstein
Meryl W. Edelstein
Georgia Bar No. 238919

**CHITWOOD HARLEY HARNES LLP**
2300 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Tel:  (404) 873-3900
Fax:  (404) 876-4476
E-mail: MEdelstein@chitwoodlaw.com

27